IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 16-cv-00011-RBJ

CHILDREN'S HOSPITAL COLORADO,

    Plaintiff/Counterclaim Defendant,

v.

DIGISONICS, INC.,

    Defendant/Counterclaim Plaintiff.

## ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT

Digisonics, Inc. moves for summary judgment on Children's Hospital Colorado's ("Children's Hospital") claims under Section 24 of the Master Service and Support Agreement ("MSA") and on its counterclaims under Section 7 of the Statement of Work ("SOW"), ECF No. 55, while Children's Hospital moves for summary judgment on Digisonics' counterclaims under Section 13 of the MSA, ECF No. 51. The motions are denied.

## BACKGROUND

On July 10, 2012 Children's Hospital and Digisonics entered into an agreement for Digisonics to develop, license, install, and support a customized cardiology picture archiving and communication system ("the System") for Children's Hospital. ECF No. 1 at ¶10, 14; ECF No. 55 at 1. The System would provide Children's Hospital's physicians an "anytime, anywhere" platform for viewing, managing, and analyzing patients' medical diagnostic data. ECF No. 58,

1

§ 2. In developing the System, Digisonics was to start with a preexisting software package called "DigiView" and to provide additional features requested by Children's Hospital. *Id.* The parties memorialized their agreement in two documents: the MSA and the SOW. The documents reference each other and were designed to work together. *See, e.g.*, ECF No. 57 at 5; ECF No. 58 at 6.

Shortly after executing the agreement, Children's Hospital made its first installment payment to Digisonics for $264,455.50, and Digisonics started working on the project. ECF No. 1 at 28; ECF No. 55 at 31; ECF No. 65 at 20. In late 2013 Digisonics requested the second installment payment, but Children's Hospital believed payment was not yet due. *See* ECF No. 53-4; ECF No. 55-21. In July 2014 Children's Hospital offered to pay half of the second installment—$238,008—until Digisonics made more progress. ECF No. 55 at 31, 36; ECF No. 65 at 20; ECF No. 68 at 5.

By the fall of 2014 Digisonics still had not delivered the System to Children's Hospital. *See* ECF No. 55 at 2; ECF No. 65 at 4. Children's Hospital became worried that the System would not be ready in time to replace its aging software without a gap in support. *See* ECF No. 64-1 at 163:10–25; ECF No. 64-4 at 132:17–23. Beginning in November 2014 executives from Children's Hospital and Digisonics exchanged a number of emails and met several times to try to resolve Children's Hospital's concerns. *See, e.g.*, ECF Nos. 64-10, 64-11, 64-13, 64-14, 64-15.

On December 2, 2014 Digisonics released and installed DigiView version 3.8.4.3 on Children's Hospital's workstation. ECF No. 64-10. In January 2015 Children's Hospital provided Digisonics a list of software issues that it wanted corrected for its "go-live" version ECF No. 55-4.

2

On June 24, 2015 Digisonics delivered DigiView version 3.8.4.6 to Children's Hospital. ECF No. 55-14. However, Children's Hospital believed that this release was still defective, so the next day it sent Digisonics notice that it was terminating the contract. ECF No. 55-19.

On January 5, 2016 Children's Hospital filed this suit for breach of contract, breach of implied duty of good faith and fair dealing, and unjust enrichment. ECF No. 1. Digisonics responded with counterclaims for breach of contract, breach of implied duty of good faith and fair dealing, unjust enrichment, promissory estoppel, and breach of confidentiality clause. ECF No. 9.

On December 26, 2016 Digisonics submitted two memoranda regarding whether briefing motions for summary judgment on the claims or counterclaims would be appropriate. ECF Nos. 39, 40. Children's Hospital took the position that the issues identified "cannot and should not be resolved on summary judgment." ECF No. 43 at 4; ECF No. 44 at 4.

On January 11, 2017 the Court invited the parties to "file a total of 25 pages of briefing per side, including all pages from the caption through the certificate of service," concerning the interpretation of MSA Section 24, SOW Section 7,[1] and MSA Section 13, with this page allowance "to be used as you see fit." ECF No. 45. This was a modest increase from the Court's practice standards. My order must not have been as clear as I thought it was, however, because each side submitted its own motion for summary judgment on January 24, 2017—notwithstanding Children's Hospital's position that the issues "cannot and should not be resolved on summary judgment"—and the parties apparently interpreted the phrase "a *total* of 25 pages of briefing" to mean "25 pages *per motion and response*." Children's Hospital submitted 49 pages

---

[1] The Court's order mistakenly referred to this provision as Section 7 of the MSA.

across the two motions, including a 25-page response to Digisonics' motion, *see* ECF Nos. 51, 65, 78, while Digisonics submitted 50 pages, including a 23-page motion, a 22-page response, and a motion for leave to file even more pages in its reply, *see* ECF Nos. 55, 68, 75, 77. These submissions would normally be struck for their excessive length, repetitiveness, and failure to stick to the issues identified in the Court's order, but instead the narrow contract interpretation issues presented will be resolved on their merits so that the trial need not be continued again.

## STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court will examine the factual record and make reasonable inferences in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## ANALYSIS

The motions for summary judgment concern three questions under different provisions of the parties' contracts: (1) whether Children's Hospital has waived any right of recovery by

4

failing to invoke the dispute resolution clause in MSA Section 24; (2) whether Children's Hospital has accepted the System and given rise to final payment under SOW Section 7; and (3) what remaining payments, if any, Digisonics may be able to recover under MSA Section 13.

The proper interpretation of these contracts is a question of law for the Court. *See USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1059 (Colo. 2005). When interpreting a contract, the primary goal is to determine and give effect to the intent of the parties. *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000). The parties' intent is to be ascertained primarily from the language of the agreement itself. *Id.* The Court gives words their plain and ordinary meaning unless it is clear that the parties intended an alternative interpretation. *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990). The Court will address each of the three disputed provisions in turn.

**A. MSA Section 24.**

Digisonics argues that the undisputed evidence shows Children's Hospital did not perform its own contractual duties under MSA Section 24 and thus cannot maintain an action for breach of contract. A prima facie case for breach of contract requires: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted). "The 'performance' element in a breach of contract action means 'substantial' performance." *Id.* "Substantial performance occurs when, 'although the conditions of the contract have been deviated from in trifling particulars not materially detracting from the benefit the other party would derive from a

5

literal performance, [the defendant] has received substantially the benefit he expected, and is, therefore, bound to pay.'" *Id.* (quoting *Newcomb v. Schaeffler*, 279 P.2d 409, 412 (Colo. 1955)).

Section 24 of the MSA is titled "Dispute Resolution and Termination." It provides that before a dissatisfied party may avail itself of any legal or equitable remedies (besides injunctive relief), the provision's "dispute resolution procedure shall be invoked." ECF No. 57, § 24. But Section 24 does not describe this dispute resolution procedure with much specificity. It does not say, for example, that a party must give any particular notice to invoke dispute resolution. Instead, it simply includes a table that "lists the levels of escalation, the duration within a level, and the associated parties at each level." *Id.* Those escalation levels are listed as follows:

| Escalation Level | Calendar Days Duration | Vendor Title | Customer Title |
|---|---|---|---|
| 1 | 15 | Director of Operations | Manager, IS |
| 2 | 15 | CTO | IS Executive |
| Final | 15 | COO | CIO |

If this dispute resolution process is unsuccessful, "then procedures as described in Section 7 of the Statement(s) of Work . . . shall take effect." *Id.*

Children's Hospital characterizes its series of interactions with Digisonics between November 25, 2014 and June 17, 2015 as satisfying the requirements of Section 24. First, Children's Hospital claims that "Escalation Level 1" began in November 2014 when its Project Manager contacted Digisonics requesting that Children's Hospital's Mary Ann Leach (CTO) and Adel Younoszai (Director of Cardiac Imaging) meet with Digisonics' Diana McSherry (CEO), James Devlin (President), and Susan Pugh (Project Manager) to discuss development delays. ECF No. 65 at 11 (citing ECF No. 64-10). Next, Children's Hospital identifies meetings in January 2015 as "Escalation Level 2," such as the January 13, 2015 meeting between these same

6

representatives (minus Dr. McSherry) and others to discuss plans for resolving "go-live" issues. *Id.* (citing ECF No. 64-13). Finally, Children's Hospital asserts that the "Final Escalation Level" began on June 8, 2015 when its Project Manager emailed all of these executives (including Dr. McSherry) expressing Children's Hospital's frustration that it still did not have a release date for the System. *Id.* at 12 (citing ECF No. 64-18). On June 17, 2015 Ms. Leach, Dr. Younoszai, Dr. McSherry, and Mr. Devlin had a phone call about Children's Hospital's immediate need for "go-live ready" software. *Id.* at 12–13 (citing ECF No. 64-19).

Digisonics uses these facts to paint a different picture. It points out that none of the emails cited mention "dispute resolution" or "Section 24," but Children's Hospital expressly used this language when a prior dispute arose in December 2013. ECF No. 77 at 3. It also emphasizes that the parties agreed to "involve executives of both teams in standard development and delivery" by November of 2014, so it understood these communications as simply routine "iterative development." *Id.*

Viewed in either light, however, no reasonable juror could take this evidence to mean that Children's Hospital failed to substantially perform its contractual duties. Children's Hospital expressed its concerns to Digisonics' relevant decisionmakers seven months before it decided to terminate the contracts—nearly five times as long of a dispute resolution period as Section 24 anticipated. These complaints went straight to the top of Digisonics' hierarchy, involving senior leadership from the get-go in an effort to resolve Children's Hospital's issues expeditiously. Although Children's Hospital apparently did not inform Digisonics that this attempted dispute resolution was "Dispute Resolution," Digisonics identifies nothing in the contracts requiring formal notice. And what difference would it have made if, for example, Children's Hospital had

7

clarified that when it told Digisonics' CEO and President the development delays were "very concerning and [a] real step back . . . from where we were a year ago," ECF No. 64-18, it was expressing its frustration under Section 24's vague dispute resolution process? Digisonics maintains that it performed adequately under the contracts, not that Children's Hospital sandbagged by keeping its complaints to itself, obstructing Digisonics' ability to correct defects, and then filing this lawsuit. Under these circumstances, there can be no doubt that at most the MSA has been "deviated from in trifling particulars" and that Digisonics "has received substantially the benefit [it] expected." *Newcomb*, 279 P.2d at 412.

### B. SOW Section 7.

Next, Digisonics argues that it is entitled to final payment because the System was deemed "Accepted" by Children's Hospital under SOW Section 7. Section 7 is titled "Error Correction and Rejection Remedy," and it states:

> Digisonics shall provide Children's [Hospital] with a correction for all material software errors in a timely manner after the conclusion of the Test Period. Children's [Hospital] shall have ten (10) business days to test any error correction (the "Correction Test Period"). The System shall be deemed "Accepted" upon the conclusion of the Correction Test Period, unless Children's [Hospital] notifies Digisonics, within five (5) business days after the conclusion of the Correction Test Period, that there any [sic] uncorrected Acceptance Errors. In the unlikely event that Digisonics fails to provide an Acceptance Error correction or mutually agreed upon work around in a timely manner or there are any uncorrected Acceptance Errors upon the conclusion of the Correction Test Period, Children's [Hospital] shall have the right to request and receive an expedited software release from Digisonics. The software release shall be implemented within 30 business days from Digisonics [sic] receipt of documentation specifying the remaining Acceptance Errors as mutually agreed upon by both parties.

ECF No. 58, § 7.

This provision, like many others in the MSA and SOW, is rife with typos and undefined terms. *See, e.g.*, MSA, ECF No. 57-24 ("If the dispute has not been resolved . . . then procedures

8

as described in Section 7 of the Statement(s) of Work describing Error Correction and Rejection Remedy (Section 7 of the Statement(s) of Work [sic] shall take effect."). There is no explanation of what the "Test Period" is, when it "concludes," what counts as "error correction" as opposed to "iterative development," and so on. Section 7's interactions with MSA Sections 5 and 24 are similarly obscure to me. But thankfully Digisonics' motion can be resolved without divining what the parties intended with this verbiage.

Digisonics' argument proceeds in several steps. First, it contends that its delivery of the System on June 24, 2015 triggered Section 7's "Correction Test Period" and thus Children's Hospital's duty to report "any uncorrected Acceptance Errors." ECF No. 55 at 3. Since Children's Hospital sent notice of termination the next day, Digisonics asserts that Children's Hospital failed to report any Acceptance Errors in time, so the System was automatically deemed "Accepted." Digisonics then declares that the System's acceptance under SOW Section 7 entitles it to Final Payment under MSA Section 13. *See id.* at 10. However, this last point is demonstrably false, bringing down Digisonics' entire argument.

Under MSA Section 13, final payment is due "upon the date that the System is accepted *according to the terms set forth under Final Systems Acceptance*." ECF No. 57-13. "Final System Acceptance" occurs after First Productive Use and after the parties satisfy the Final System Acceptance Criteria specified in SOW Section 6. *Id.* § 5. Digisonics tries to get around Section 13's clear language by misquoting the provision, apparently in the hopes of misleading the Court into believing that Section 13 refers to "Accept[ance]" in SOW Section 7 rather than "Final System Acceptance" in MSA Section 5. *See, e.g.*, ECF No. 55 at 21 ("For the reasons stated above, the CHCO Release was deemed 'accepted' under Section 7 of the SOW. Pursuant

9

to Section 13(a)(iii), final payment is 'due upon the date that the [CHCO Release] is accepted.' Despite the contractual language, CHCO failed to make the final payment to Digisonics . . . ." (citation omitted)).  But SOW Section 7 cannot bypass MSA Section 5 and independently trigger Children's Hospital's duty to make final payment.  (More on that below.)  Whatever "Accepted" means, it does not mean "accepted according to the terms set forth under Final System Acceptance."

### C. MSA Section 13.

Separately, Children's Hospital moves for summary judgment on Digisonics' counterclaim for damages under Section 13 of the MSA.  This is puzzling because Children's Hospital previously represented to the Court that this issue "requires consideration of multiple questions mixing law and disputed fact that cannot be resolved on summary judgment."  ECF No. 43 at 3.  After reading the parties' briefs, I confess that things appear to me now as they appear to have appeared to Children's Hospital back in January.

Section 13, "Payment Terms," outlines three sequential payments to Digisonics:

> The total purchase price for the System . . . as set forth in the Digisonics System Quotation . . . shall be payable and due no later than 45 days from invoice issuance as follows:
>
>> i. First payment of twenty-five percent (25%) due upon placement of the order via an official Children's [Hospital] issued purchase order.
>>
>> ii. Second payment of forty-five percent (45%) is due upon the date the System is Available for first use.
>>
>> iii. Final payment of thirty percent (30%) is due upon the date that the System is accepted according to the terms set forth under Final Systems Acceptance above.

ECF No. 57, § 13(a). Digisonics has already received the first payment and half of the second payment, so it seeks the remainder of the second payment and the final payment.

At the outset, Children's Hospital argues "[i]t is undisputed that the Parties intended sections (i)-(iii) of Section 13[(a)] to operate as a series of conditions" and that they amended Section 13(a)(ii) with four new conditions. ECF No. 51 at 7–8. Digisonics counters that they did not agree to amend Section 13(a)(ii) and, in any case, that it satisfied all of these conditions, or at least it would have if Children's Hospital had cooperated in good faith. ECF No. 68 at 11–16, 19–20. But the Court must determine the parties' intent for Section 13(a) and its alleged amendment from the language of these instruments, not from the parties' shifting litigation positions. *See Ad Two, Inc.*, 9 P.3d at 376.

Contract terms can often be interpreted as either conditions precedent or promises to perform. *Main Elec., Ltd. v. Printz Servs. Corp.*, 980 P.2d 522, 526 (Colo. 1999). However, "a condition precedent in a contract is not favored and will not be given effect unless established by clear and unequivocal language." *Id.* Indeed, the Court "will interpret a clause as a promise rather than a condition unless the language of the contract explicitly mandates otherwise." *Id.* For example, a provision instructing that a duty is to be performed "when" an event occurs will usually be interpreted to mean that performance is due "at such time" as the event would ordinarily occur (a promise) rather than "only if" it occurs (a condition). *See* Restatement (Second) of Contracts § 227 cmt. b (1981). "This rule of contract interpretation expresses the recognized policy of avoiding the harsh results of forfeiture against a party who has no control over the occurrence of the condition." *Main Elec., Ltd.*, 980 P.2d at 526.

11

In this case the payment schedule served as Children's Hospital's promise to pay at certain intervals, not conditions precedent to Digisonics' entitlement to payment. Section 13(a)'s opening words frame the schedule as a timeline for Children's Hospital to make payments rather than a list of conditions precedent. *See* ECF No. 57, § 13(a) ("The total purchase price for the System . . . shall be payable and due no later than 45 days from invoice issuance as follows . . . ."). The first clause ties payment to an event that was entirely within Children's Hospital's control. *See id.* § 13(a)(i) ("First payment . . . [is] due upon placement of the order via an official Children's [Hospital] issued purchase order."). Similarly, the second clause—both as it appears in the MSA and as it was purportedly amended—as well as the third clause give Children's Hospital significant discretion over whether the payment-triggering events occur. Section 13(a)(ii) references "the date the System is Available for first use," which takes place when, among other things, Digisonics has fulfilled all of Children's Hospital's feature requests. *See* ECF No. 57, § 6; ECF No. 58, § 4. The alleged amendment introduces four new criteria, such as Children's Hospital's "use of the DigiView software to review seventy consecutive cases" without its reporting critical issues, crashes, or additional defects. ECF No. 51 at 8 (citing ECF No. 68-5). And Section 13(a)(iii) pledges final payment when Children's Hospital accepts the System under "a mutually acceptable plan for system acceptance." *See* ECF No. 57, § 5; ECF No. 58, § 6.

Since Section 13(a) does not explicitly mandate that its payment events be treated as conditions precedent, and Digisonics could not control whether these events ultimately occurred, the events are not conditions precedent to payment. Consequently, if Digisonics has prevented these payment events from taking place, then Children's Hospital's remedy is the recovery of

damages, not outright forfeiture of Digisonics' claims. *See Charles Ilfeld Co. v. Taylor*, 397 P.2d 748, 750 (Colo. 1964). The exact amount of damages, of course, is a question of fact for the jury.

Children's Hospital need not worry about Digisonics over-recovering for services it did not provide. *See* ECF No. 51 at 10–12. If Digisonics succeeds on its breach of contract claim, then it is entitled only to the benefit of its bargain. *See Gen. Ins. Co. of Am. v. City of Colorado Springs*, 638 P.2d 752, 759 (Colo. 1981) ("Generally, the measure of damages for a breach of contract is the loss in value to the injured party of the other party's performance caused by its failure or deficiency, plus any other incidental or consequential loss caused by the breach, less any cost or other loss that the injured party has avoided by not having to perform."). Digisonics could thus recover at most the net profits it would have earned by performing the services in question—its expected revenue minus costs avoided by not having to perform these services— and any incidental or consequential losses.[2]

**ORDER**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [ECF No. 51] and Defendant's Motion for Summary Judgment [ECF No. 55] are DENIED.

DATED this 27th day of June, 2017.

BY THE COURT:

---

[2] Children's Hospital may wish to brush up on its "basic, black letter legal principle[s]." ECF No. 78 at 7. It is simply not true that "a party seeking to enforce a contract must demonstrate that it has fulfilled *all* of its obligations under the contract." *Id.* (emphasis added) (citing *W. Distrib. Co.*, 841 P.2d at 1058). As stated in the very case Children's Hospital cites, a party seeking to recover for breach of contract must demonstrate only "substantial" performance under the contract. Children's Hospital thus makes no sense when it claims "Digisonics must prove that it fulfilled each of the service obligations in the System Quotation before it can recover damages for [Children's Hospital's] failure to pay for those services." ECF No. 51 at 12. Hopefully Digisonics' ability to recover is now clear.

13

R. Brooke Jackson
United States District Judge